**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WAGDI Z. ANTON, | ) | CASE NO. 5:23-CV-00391-CEH |
| | ) | |
| Plaintiff, | ) | JUDGE CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM OF** |
| Defendant, | ) | **OPINION & ORDER** |
| | ) | |

## I. Introduction

Plaintiff, Wagdi Z. Anton ("Anton" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 6). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

## II. Procedural History

On January 27, 2021, Claimant filed applications for DIB and SSI, alleging a disability onset date of December 1, 2017. (ECF No. 5, PageID #: 48). The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On January 14, 2022, an ALJ held a hearing, during which Claimant, represented by counsel, and Claimant's wife, as well as an impartial vocational expert, testified. (*Id.*). On April 21, 2022, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID

1

#: 48-65).  The ALJ's decision became final on December 28, 2022, when the Appeals Council declined further review.  (*Id.* at PageID #: 24).

On February 27, 2023, Claimant filed his Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 7, 9, 11). Claimant asserts the following assignments of error:

1. The ALJ erred when he failed to properly evaluate the opinions of the treating sources in accordance with 20 CFR 404.1520c and 416.920c.

2. The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Plaintiff's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

3. The ALJ erred when he failed to comply with Social Security Ruling 18- 01p when he established Plaintiff's onset date.

(ECF No. 7 at 1).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

The claimant testified that he had difficulty with his recent memory and unable to perform any job. He also testified he was unable to work due to pain in his hands that limited his ability to use his computer and performing some daily activities.

(ECF No. 5, PageID #: 56).

### B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

Prior to the relevant time-period, the record showed in 2018, the claimant had a single seizure and was taking Keppra. He had not received ongoing treatment from a neurologist. In addition, in 2019, the claimant received treatment for diabetes, mellitus. His HgA1c was 7.2 (1F). Then in July 2020, the claimant was using an insulin pump (2F/13).

In October 2020, the claimant attended a neurological assessment. He had a history

2

of an abnormal MRI of his brain showing enhanced nonspecific patchy lesions in the frontal lobe and left periventricular tissues which were, definitely-diminishing compared to prior study in August 2018. There was global atrophy for age with ventriculomegaly. He had questionable diagnosis of multiple sclerosis. He was taking Lamictal for seizure prevention. At that time, the claimant reported feeling well. He denied having any focal weakness. The claimant said he had some difficulty with his memory. However, he said "his memory was improving." The claimant was ambulatory without the use of any assistive device. His mood was bright. His neurological assessment was unremarkable. He had 5/5 muscle strength and tone. He had normal gait and station (2F).

At the neurological assessment in January 2021 the claimant denied having any neck or back pain. The examination showed the claimant was alert and oriented to person, place, and time. He had abnormal reflex diffusely diminished. He had normal muscle strength and tone. He had normal gait (3F/10). The neurological assessment showed the claimant was alert and oriented. He was attentive with normal cognition. His memory, speech and affect were normal. His arms were coordinated with symmetrical strong movements of both arms. He raised arms well above head. He manipulated his phone and small objects well. Rapid movements were symmetrical and normal. His leg rise was normal. He could rise, walk on heels and toes. He had a casual and normal gait. The claimant had an EEG that was normal. The claimant was referred to speech therapy for language and cognitive testing (3F/11). However, the claimant did not have the assessments for several months (22F: 24F).

In February 2021, the claimant received treatment for intracranial lesion with encephalomalacia and gliosis. He had a total of three unprovoked seizures and had a seizure the year before. However, his seizures were well controlled on 400 mg of Lamictal. The claimant attended the appointment without his spouse, and he continued working three hours per day. The claimant denied having headaches or falls or focal weakness. The examination showed he was alert and oriented to person, place, and time. He had abnormal reflex diffusely diminished. He had normal muscle strength and tone. He had normal gait (3F). The claimant was referred to a neurologist closer to his home (pg8).

Then in March 2021, the examination of the claimant for his diabetes assessment showed his insulin pump and sensor was in place. The claimant had normal range of motion in his neck. He had no chest wall tenderness. He had normal bowl sounds. He had normal reflexes. He had normal sensation to monofilament of his bilateral feet (10F/57). May 2021, the claimant had a normal physical examination. His HgA1c was 7.8 (8F). The claimant was doing well with his current dose of insulin (19F). June 2021 the claimant had a normal physical examination. His diagnostic testing showed HgA1c was 7.9 (10F).

Subsequently in July 2021, the claimant attended a neurological assessment. At that time, the claimant requested a lower dose of Lamictal. The claimant was having

headaches but only when he was tired. The headache did not last long and not worrisome. He was having some stiffness in his hands and weaker grip strength, which was unrelated to time of day. He denied dropping things. The examination of the claimant showed he was alert and oriented to person, place and time. His speech and language were normal. His attention and concentration wee [sic] normal. His memory was grossly normal. He had normal fund of knowledge. He had normal muscle strength, except 3/5 grip strength. Atrophy of intrinsic muscles of the hands was visible. He had decreased pinprick in ulnar distribution of both hands. He had normal coordination in his upper and lower extremities. There was no evidence of tremors. He had normal gait (11F). The claimant was advised to seek an assessment for his hand pain (11F).

In August 2021, the claimant had an MRI of his brain that showed there was no restricted diffusion to suggest ischemia. There was previously seen enhancement in the left frontal horn of the left lateral ventricle Previously seen left parasagittal front lobe was not definitively present on current study. Elsewhere there was diffuse brain volume loss versus arachnoid cyst. There was diffuse atrophy involving the corpus callosum as before. There were no changes since the prior study. The MRI of his cervical spine showed multilevel degenerative disc disease, somewhat progressed from prior study most notably at the C3-C4. There was no definite cord abnormality (11F/133-134).

Nevertheless, the claimant did not have headaches or seizures. In addition, the claimant did not receive treatment for neck pain (1F). In September 2021, the physical examination was normal. He had normal range of motion in his neck. The sensor was insulin pump was in place. He had no edema in his extremities. He had normal muscle tone. His reflexes were normal and symmetric. His behavior mood and affect were normal (23F/40).

On October 28, 2021, the claimant, finally attended an orthopedic assessment for bilateral numbness and tingling in his hands, right worse than left and intermittent in nature. The claimant told the physician he started a new job at a gas station and was concerned about taking time off for surgery. He denied having nighttime awakening due to pain. However, he would drop things and had mild discomfort. The orthopedic assessment showed the claimant had negative Tinel's at the wrist and carpal compression. He had positive Tinel sign of the elbow and 4/5 intrinsic muscle strength in his upper extremities. The claimant had a nerve compression study that showed he had cubital tunnel syndrome bilaterally. The claimant was advised, strongly to undergo surgical ulnar nerve release (21F)

However, the claimant did not have the hand surgery as recommended by the orthopedic specialist (Testimony). Furthermore, the claimant did not seek another assessment or any treatment for his hand pain (24F: Testimony). The claimant testified he had difficulty using his hands, shaving, dropping items and buttoning clothes (Testimony). As such, these limitations were accommodated in the residual functional capacity set forth herein.

4

Nevertheless, the claimant was able to perform activities. The claimant indicated he was home alone during the day. He indicated that he was doing some tasks, driving, grocery shopping and attending appointments. He was working parttime (5E). In August 2021, the claimant was walking several miles per day. Then in October 2021, the claimant started a new job, working fulltime at a Quik Stop in Akron (20F). As such, the evidence supported the conclusion the claimant was able to perform light work as described herein.

*Regarding his mental impairments*, the claimant received treatment in 2019 for depression and anxiety. He was having difficulty with work and with family relationships. The claimant's work had declined. He was procrastinating about studying for a test that he needed to take. The mental status evaluation was normal. The claimant was prescribed medications (5F). By January 2020, the claimant was "doing well." He was told to continue taking his medications (5F/4).

In March 2020, the claimant had some difficulty with motivation and his medications were adjusted (pg5). The claimant was dosing his Keppra down and his mood improved (5F). By July 2020, his mood had improved. He was going for walks and losing weight (5Fpg9). August 2020, the claimant indicated that "work was slow due to Covid-19 and not assigned more than three hours of work." However, he said he "was exploring other work situations" (pg10). September 2020, the claimant had been out of medication for two days and had not contacted the physician for medication. Nevertheless, the claimant's mental status was normal. The claimant continued to walk for exercise and was trying to lose weight (pg11). In October 2020, he was concerned about finances. He said he planned on talking to his boss about having his hours and rate of pay increased (pg13). By December 2020, the claimant continued to walk outside when the weather was good. He was less anxious and less depressed (5Fpg16).

Then in January 2021, the claimant was "doing significantly better." He was responding well to medication. He had lost weight. The claimant was anxious about the family finances. However, he applied for assistance and continued working parttime (5F/17). In March 2021, he started to study for his tax preparer license. However, he was feeling anxious "due to the lack of work hours" since he was, only working at his job three to four hours per day (5Fpg18).

In May 2021, the claimant said he was feeling depressed, and lost his confidence about doing tax preparer work. The claimant was encouraged to find different work but said he did not feel comfortable doing physical labor. According to his wife, the claimant would occasionally, forget to purchase certain items when shopping, although most of the time the claimant was purchasing what was asked. Furthermore, the claimant was able to drive himself to work and to the grocery store (9F).

Subsequently in June 2021, the claimant was titrating his dose of Effexor to

5

improve his depression and anxiety (9Fpg4). The following month, August 2021, the claimant was "doing better." He was walking, outside several miles per day. The claimant mentioned he walked up to seven miles per day. He had lost weight and motivated to do so. In addition, the claimant was working two hours every other day. He had no agitation or aggression. The claimant drove to the provider's office by himself. The claimant's mental status evaluation was normal (20F).

In contrast to his testimony, in October 2021, the claimant had started a "new job and "working thirty to forty hours per week." He was planning to go to California to attend a wedding. He said he was, occasionally frustrated with his relationship with his wife, but otherwise doing well. The provider noted the claimant was doing significantly better and his mood was better. He had no agitation or aggression (20F). The mental status evaluation of the claimant showed claimant was alert and oriented to person, place, and time. His memory was intact. His mood was less anxious and depressed. His affect was appropriate. His thought process was coherent and logical. He had good judgement (pg25).

At his mental health appointment on December 20, 2021, *in contrast to his testimony*, the claimant was working fulltime at a Quik Stop store in Akron. Overall, he said he was "feeling well" (20Fpg26). The mental status showed the claimant was alert and oriented to person, place, and time. His memory was intact. His mood was less anxious and depressed. His affect was appropriate. His thought process was coherent and logical. He had good judgement (pg26).

In addition, in December 2021, the claimant attended some speech and language therapy to improve his memory. During the assessment, the claimant's wife reported to the speech and language examiner, that the claimant had difficulty performing tasks, such as doing finances. He had poor initiation to tasks and response to direct questions. He had gotten lost while driving and forgotten to purchase items at the store. The speech therapist indicated the claimant presented with mild to moderate cognitive deficits. However, the speech therapist noted the claimant's functioning was slightly below functional limits. He was told to attend six sessions to improve his memory and become more functional (22F).

After attending a few speech therapy sessions, the provider noted the claimant was responsive to cues in therapy. However, his wife said that prompting did not carry over to function at home. The claimant attended limited treatment and did not continue attending speech and language therapy after January 2022 (22F: Testimony). Furthermore, the claimant was referred to the Office for Ohioans with Disabilities to obtain some work (22F). However, there was no evidence the claimant attended any work-related assessment, as advised.

Thereafter in February 2022 the claimant attended a neurocognitive evaluation which assessed the claimant's memory, attention, executive functioning, and motor skills, that was performed by DeAnna Frye, Ph.D. The claimant indicated that he was able to perform activities, but initiation and motivation were difficult. The

claimant was able to drive and had no concerns or had any recent auto accidents (24F).

The neurocognitive evaluation showed the claimant's Full Scale Intellectual Quotient fell within the low average range. He had some weakness related to verbal comprehension. However, the examiner noted that caution was needed given that the claimant's primary language was not English, but Arabic. Performance on measures of attention were intact and did not provide any evidence of disruption of attention function. Measures of language function needed to be interpreted with caution but suggest difficulty with semantic fluency and phonemic naming. However, the claimant said he could identify words in Arabic, just not in English. His Visual Perceptual Function was in the average range. The claimant's memory function was intact with regard to encoding, retrieval and recognition of auditory tasks. His performance on visual recall was impaired, but this was more likely reflective of difficulty with the executive function demands of the tasks as opposed to memory deficit. Measures of his executive function indicated average performance on a measure of rapid set shifting, while conceptual reasoning was significantly diminished. The claimant had difficulty with visual planning and organizational demands of a visual memory tasks. Assessment of his upper extremity motor function indicated high average graphometer speed. He had significant impairment on bilateral fine motor speed and dexterity tasks which was most likely reflective of his ulnar nerve neuropathy and his self-report of changes in sensory ability in his hands. Assessment of his mood indicated the presence of significant affective distress characterized by depressive and anxiety symptoms (24F).

The examiner concluded the claimant had impaired executive functions with some indication of diminished expressive language abilities, significant affective distress characterized by depressive and anxiety symptoms (pg1). However, the examiner noted that she regarded the results of the test with caution since English was the claimant's second language (24F).

(*Id.* at PageID #: 56-60).

IV.    **The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025 (3D).

2. The claimant engaged in substantial gainful activity during the following periods: December 1, 2017, through December 31, 2021 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity (January 2021 and through the date of the decision). The remaining findings address the period(s) the claimant did not engage in substantial gainful activity

4. The claimant has the following severe impairments: cervical degenerative spondylosis, bilateral cubital tunnel syndrome, multiple sclerosis, and demyelinating disease of central nervous system with brain lesions, seizure disorder and epilepsy, type 1 diabetes mellitus with hyperglycemia, depressive disorder, bipolar disorder, adjustment disorder anxiety disorder, panic disorder and neurocognitive disorder (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes or scaffolds and occasionally climb ramps and stairs. He can frequently balance, stoop, kneel, crouch and crawl. He can frequently handle and finger with bilateral upper extremities. He would need to avoid concentrated exposure to extreme cold and vibration and avoid all exposure to hazards, including unprotected heights, moving mechanical parts and operation of motor vehicles. He can perform simple, routine and repetitive tasks, but cannot perform tasks which require a high production rate-pace (for example assembly line work) and can respond appropriately to only occasional changes in a routine work setting.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(*Id.* at PageID #: 50-52, 55, 63-64).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work

in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

## C. Discussion

Claimant raises three issues on appeal, arguing that (1) the ALJ erred in his evaluation of certain medical opinions; (2) the ALJ did not comply with SSR 16-3p in his consideration of Claimant's symptoms; and (3) the ALJ did not comply with SSR 18-01p when he determined Claimant's onset date.

### 1. The ALJ properly considered the medical opinions.

Claimant challenges the ALJ's treatment of the opinions of Dr. DeAnna Frye, Sarah Netro, and the State agency consultants.

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 416.920(e). For claims filed after March 27, 2017, the regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings." 20 C.F.R. § 416.920c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.*

Medical source opinions are evaluated using the factors listed in § 416.920c(c). The factors include supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." *Id.* at § 416.920c(c). The ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. *Id.* at § 416.920c(b)(2). Under the regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" and ""[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c). Additionally, the decision must build an accurate and logical bridge between the evidence and the conclusion. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011).

### a. Dr. DeAnna Frye

As detailed in the medical history, Dr. DeAnna Frye completed a neurocognitive assessment of Claimant. The ALJ explained how he considered Frye's opinion:

> After the neurocognitive assessment was completed in 2022, the neuropsychologist, DeAnna Frye, Ph.D., encouraged the claimant to follow through with seeking disability benefits. Dr. Frye opined that the claimant had significant cognitive impairment will not allow him to engage in any form of competitive employment at that time. He would have difficulty following directions and unable to engage in effective decision making. His level of cognitive impairment represented a moderate to severe barrier with regard to his ability to engage in any form of gainful employment.
>
> The opinion from Dr. Frye was not persuasive since this was not consistent with the evidence in the record from other providers who treated the claimant. In December 2021, the claimant was working fulltime at the Quik Stop. The mental

11

status evaluation of the claimant showed he was alert, oriented to person, place and time. His memory was intact. He was less anxious and less depressed. His affect was appropriate. He was coherent and logical. He had good judgement (20F).

Furthermore, the neuropsychologist noted the claimant was not following medical advice and indicated that the claimant's untreated obstructive sleep apnea could have an effect on his cognitive impairment and may also be contributing to his current profile (24F). Moreover, the examiner noted that the interpretation of test performance was completed with utilization of normative data derived from individuals with English as their primary language. As a result, the claimant's performance on tasks assessing language should be interpreted with caution since his primary language was Arabic, not English. Furthermore, the claimant provided statements to Dr. Frye regarding his depression, anxiety and balance that were inconsistent with the treatment record (24F: 20F).

(ECF No. 5, PageID #: 62).

Claimant argues that in discounting Frye's opinion, the ALJ improperly relied on Plaintiff's full-time work at Quik Stop, "[a]n allegation with no proof in the record and contradicted by the ALJ also finding Plaintiff could perform activities when he was home alone during the day." (ECF No. 7 at 11). Claimant argues that his "memory problems were documented in the record" such that the "objective testing and medical records supported and were consistent with the findings of Dr. Frye regarding Plaintiff's impaired executive function and memory problems." (*Id.* at 11-12). Thus, Claimant argues that "[t]he stated rationale for failing to include the cited limitations in the RFC was contrary to the evidence in this matter and not supported by substantial evidence." (*Id.* at 12).

The Commissioner replies that the ALJ "discussed Dr. Frye's evaluation at length in his decision, explaining why he found Dr. Frye's opinions not persuasive." (ECF No. 9 at 9-10). The Commissioner asserts that the ALJ addressed the reasons Dr. Frye's opinion was inconsistent with the record and unsupported by her own evaluation. (*Id.* at 11). As to the argument that there is no evidence of Claimant's employment at Quik Stop, the Commissioner asserts that this "is simply wrong" because "Plaintiff himself informed his psychiatrist in October and December 2021 that

he was working 'full-time,' and later, 30-40 hours a week, at a gas station." (*Id.* at 12).

Claimant replies that "Dr. Frye had the benefit of three brain MRIs which revealed patchy lesions n [sic] the frontal lobe with global atrophy for age, decrease within the left frontal lobe, and atrophy of the corpus callosum (connecting the two hemispheres of the brain)" such that the "ALJ's evaluation of this neuropsychological evaluation was not supported by substantial evidence necessitating a remand of this matter." (ECF No. 11 at 2 (citations omitted)).

The ALJ's discussion of Frye's opinion makes clear that he considered the supportability factor in finding the opinion unpersuasive. The ALJ found Frye's opinion was not supported by her own observation that Claimant's cognitive impairment could be related to his failure to comply with treatment of his sleep apnea. (ECF No. 5 at PageID #: 62; *see id.* at PageID #: 1458). The ALJ also noted that "claimant's performance *on tasks assessing language* should be interpreted with caution since his primary language was Arabic, not English." (*Id.* at PageID #: 62). In reciting the medical history, the ALJ noted that several of Frye's tests showed Claimant in the average range. (*Id.* at 60; *see id.* at PageID #: 1459).

The ALJ also addressed consistency. The ALJ observed that Claimant made statements to Dr. Frye regarding "his depression, anxiety and balance that were inconsistent with the treatment record." (*Id.* at PageID #: 62). The ALJ specifically cited to a medical record where Claimant reported he was working full time and overall "feeling better" three months before Frye's evaluation. (*Id.* at PageID #: 1360). Contrary to Claimant's argument, the fact that Claimant was working is supported by his own statements to his providers. (*Id.* at PageID #: 1359-1360).

Because the ALJ addressed both supportability and consistency, he complied with the regulations in finding Frye's opinion unpersuasive and substantial evidence supports that conclusion. The Court must defer to the ALJ's decision, "even if there is substantial evidence that

would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

### b. Sarah Netro

Claimant next challenges the ALJ's treatment of Sarah Netro's opinion. As to this opinion, the ALJ stated:

> In December 2021, the speech and language therapist, Sarah Netro, SLP., opined the claimant had mild to moderate cognitive deficits that had profound impact on his ability to work and daily function (22F/3). Thereafter, Ms. Netro opined the claimant presented with deficits in memory, planning and executive function that would impact his ability to return to work and complete meaningful tasks at home. The opinion from Ms. Netro was not persuasive since the opinion was based on subjective statements from the claimant's spouse. Furthermore, the therapist only provided limited speech and language treatment to the claimant (22F: Testimony). Moreover, the opinion regarding the claimant's memory, attention and executive function exceeded her expertise as a speech and language therapist. In addition, the opinion was inconsistent with the claimant's neurocognitive assessment and mental health treatment record (24F: 20F).

(ECF No. 5, PageID #: 61-62).

Claimant argues that while the ALJ indicated the opinion was "based on the statements from Plaintiff's spouse" and "exceeded [Netro's] expertise as a speech and language therapist," Netro "completed a linguistic evaluation to determine these issues" and observed Plaintiff over subsequent sessions. (ECF No. 7 at 12-13). She argues that "[t]hese records supported and were also consistent with the report of Dr. Frye" such that the ALJ's "stated rationale for failing to include the cited limitations in the RFC was contrary to the evidence in this matter and was not supported by substantial evidence." (*Id.* at 13).

The Commissioner argues that the ALJ properly found Netro's opinion not persuasive. The Commissioner asserts that in addition to observing that Netro's opinion relied on subjective reports from Claimant's spouse, the ALJ considered that Netro "only provided limited speech and language treatment to Plaintiff;" Netro's opinions regarding memory, attention and executive

function exceeded her expertise as a speech and language therapist; and the opinion was inconsistent with the record. (ECF No. 9 at 13-14).

Claimant replies that "[e]ven if Ms. Netro noted the reports of Plaintiff's spouse, she based her opinion on . . . brain MRIs as well as her meetings with Plaintiff." (ECF No. 11 at 2).

The Court concludes that the ALJ considered multiple of the relevant factors in finding Netro's opinion not persuasive. As to supportability, the ALJ noted that Netro's opinion "was based on subjective statements from claimant's spouse." (ECF No. 5, PageID #: 61); *see Owens v. Comm'r of Soc. Sec.*, No. 3:20-CV-01737-JJH, 2021 WL 8342841, at *6 (N.D. Ohio Sept. 15, 2021), *report & recommendation adopted*, 2023 WL 6283030 (N.D. Ohio Sept. 27, 2023) ("While the ALJ did not use the term 'supportability' in his evaluation, it is clear that the ALJ's finding that [a specific] opinion was based heavily on Claimant's subjective  complaints is a finding that the opinion lacked the support of objective evidence."). Although Claimant is correct that Netro conducted a linguistic evaluation, the Court's review indicates that such relies largely on Claimant's wife's report. (ECF No. 5, PageID #: 1381-84). The ALJ considered consistency when he specifically noted that Netro's opinion was not consistent with the neurocognitive assessment and mental health treatment record indicating that Claimant was working full time and feeling better. (*Id.* at PageID #: 62; *see id.* at PageID #: 1360). In addition to the required supportability and consistency factors, the ALJ also considered the length of the treatment relationship, noting that Netro provided only "limited speech and language treatment to the claimant," and Netro's area of practice, observing that her opinion as to "memory, attention and executive function exceeded her expertise as a *speech and language* therapist." (*Id.* at PageID #: 62 (emphasis added); *see id.* at PageID #: 1393 (discontinuing treatment after 5 sessions)).

Because the ALJ considered the relevant factors in finding Netro's opinion not persuasive

and substantial evidence supports that decision, the Court must defer to it. *Wright*, 321 F.3d at 614.

    **c.  State agency opinions**

Claimant challenges the ALJ's treatment of the State agency physicians' opinions. As to these opinions, the ALJ stated:

> The State agency physicians opined the claimant could perform light work and frequently climb ramps and stairs, never ladders, ropes or scaffolds. He could frequently stoop, kneel, crouch and crawl. He should avoid all exposure to hazards (3A: 4A: 7A: 8A). The opinions from the State agency physicians were persuasive since the conclusion was generally, consistent with the evidence. However, the claimant developed some untreated hand pain which was accommodated in the residual functional capacity set forth herein (21F).

(ECF No. 5, PageID #: 62).

Claimant argues that the State agency physicians "had last reviewed the medical evidence in September 2021, and had not had the opportunity to review the nerve conduction testing which demonstrated bilateral median neuropathies at or distal to the wrist which was moderate." (ECF No. 7 at 13). The Commissioner responds that the ALJ included handling and fingering limitations that were not indicated in the State agency opinions "to accommodate Plaintiff's hearing-level complaints of untreated cubital tunnel syndrome" and there is no evidence to support a greater limitation to occasional, rather than frequent handling and fingering. (ECF No. 9 at 14). Additionally, the Commissioner argues that any error is harmless because "the vocational expert at the hearing testified that, a hypothetical claimant with Plaintiff's RFC and a limitation to occasional handling and fingering would still be able to perform work, including light, unskilled work as an usher and as a boat rental clerk." (*Id.* at 15).

The Court finds Claimant's argument meritless because the ALJ considered all the evidence in the record in formulating the RFC. As this Court has previously recognized,

> "There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record." *Robinson v.*

*Comm'r of Soc. Sec. Admin.*, No. 5:14-CV-291, 2015 WL 1119751, at \*11 (N.D. Ohio Mar. 11, 2015). "The opinions need only be 'supported by evidence in the case record.'" *Id.* (quoting *Helm v. Comm'r of Soc. Sec. Admin.*, 405 F. App'x 997, 1002 (6th Cir. 2011)). Indeed, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion." *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at \*6 (N.D. Ohio Sept. 4. 2018) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)).

*Langford v. Comm'r of Soc. Sec.*, No. 1:22-CV-006565-CEH, 2023 WL 3058160, at \*24 (N.D. Ohio Apr. 24, 2023).

The ALJ here provided a detailed summary of the evidence, including discussing the specific record Claimant cites. (ECF No. 5, PageID #: 58). The ALJ cited this same record when he found that limitations not included in the State agency opinions were warranted based on Claimant's hand pain. (*Id.* at PageID #: 62). Thus, there can be no dispute that the ALJ considered all of the record evidence such that he did not err in his analysis of the State agency opinions.

### 2. The ALJ complied with SSR-16-3p in considering Claimant's symptoms.

Claimant argues that the ALJ erred when he failed to properly apply the criteria of SSR 16-3p in considering Claimant's symptom testimony. (ECF No. 7 at 14). Claimant provides a lengthy recitation of the evidence before arguing that such "provided evidence regarding the intensity, persistence and limiting effects of Plaintiff's symptoms along with the limited nature of his daily activities and the difficulties he had." (ECF No. 7 at 18). He argues that the ALJ "appeared to rely on the fact that Plaintiff returned to work in October 2021 as the rationale for finding that his symptoms were not limiting as alleged" but this return to work is not reflected in the New Hire Quarterly Wage Report. (*Id.*). Claimant further argues that "[f]inding that Plaintiff was home alone during the day and that he was also working full time were inconsistent findings" and "clearly

demonstrated that the decision was not supported by substantial evidence." (*Id.* at 19).

The Commissioner asserts that "Plaintiff provides no support for his argument that the ALJ erred beyond reciting the medical evidence, pointing to his subjective complaints, and arguing that his interpretation should outweigh the ALJ's interpretation of the evidence" such that his argument "is both undeveloped and unavailing." (ECF No. 9 at 16). The Commissioner argues that "substantial evidence supports the ALJ's evaluation of Plaintiff's symptoms, and the ALJ adequately articulated his reasons for discounting Plaintiff's claims of disabling limitations." (*Id.* at 17). As to the ALJ's reliance on Claimant's work, the Commissioner argues that "the ALJ did not err by considering that Plaintiff was able to perform full-time work for a period of time, and that, as Plaintiff testified, when he is home alone, he is able to independently perform all his activities of daily living" because "[t]hese two observations are not mutually exclusive." (*Id.* at 20).

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: daily activities; location, duration, frequency, and intensity of the pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the individual uses to relieve symptoms; and any other factors concerning the

individual's functional limitations and restrictions.  2017 WL 5180304 at *7-8. The ALJ need not

analyze all seven factors but should show that she considered the relevant evidence. *See Cross v.*

*Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). SSR 16-3p states:

> [I]f an individual's statements about the intensity, persistence, and
> limiting effects of symptoms are inconsistent with the objective
> medical evidence and the other evidence, we will determine that the
> individual's symptoms are less likely to reduce his or her capacities
> to perform work-related activities or abilities to function
> independently, appropriately, and effectively in an age-appropriate
> manner.

The ALJ's "decision must contain specific reasons for the weight given to the individual's

symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess

how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see*

*also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's

testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court

gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will

not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of*

*Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*,

486 F.3d at 248–49), *report and recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug.

8, 2019).

Here, the ALJ observed that Claimant's statements about the intensity, persistence, and

limiting effects of his symptoms were "inconsistent because the evidence does not support the

assertion that the claimant cannot work." (ECF No. 5, PageID #: 56). After detailing the medical

records relating to Claimant's physical impairments, the ALJ observed:

> Nevertheless, the claimant was able to perform activities. The claimant indicated
> he was home alone during the day. He indicated that he was doing some tasks,
> driving, grocery shopping and attending appointments. He was working parttime
> (5E). In August 2021, the claimant was walking several miles per day. Then in

> October 2021, the claimant started a new job, working fulltime at a Quik Stop in
> Akron (20F). As such, the evidence supported the conclusion the claimant was able
> to perform light work as described herein.

(*Id.* at PageID #: 58). Similarly, he found that Claimant's ability to perform "activities while he was home, alone during the day" and start a new job working fulltime in 2021 "supported the finding the claimant was capable of performing unskilled work as described herein." (*Id.* at PageID #: 60).

Based on this discussion, the Court concludes the ALJ properly considered the relevant factors. The ALJ considered Claimant's daily activities, citing to records including Claimant's reports that he was working (parttime initially and later fulltime), drove to the store alone, took care of his medications, followed up with his doctor, and walked for exercise to lose weight. (ECF No. 5, PageID #: 1355-56, 1359-1400). In the medical history, the ALJ discussed Claimant's medications and his overall positive response. (*Id.* at PageID #: 57 (noting that seizures were "well controlled on 400 mg of Lamictal" and Claimant was "doing well with his current dose of insulin"); *id.* at PageID #: 59 (responding well to medication and feeling "significantly better")). The ALJ also considered Claimant's own reports to his provider that he was working full time, which are certainly relevant to Claimant's functional limitations.

The Court agrees with the Commissioner that the ALJ's conclusions that Claimant performed activities while home alone during the day and that he was working fulltime are not mutually exclusive. In concluding that Claimant was able to be home alone, the ALJ cited Claimant's June 2021 function report indicating that he cares for his dog and performs his own personal care with assistance from his wife. (ECF No. 5 at PageID #: 299). The ALJ also cited Claimant's reports to his provider concerning his daily activities during visits *before* he started working fulltime in October 2021. (*Id.* at PageID #: 1355). Thus, Claimant's own statements to

his providers support both the ALJ's conclusions.

Overall, the ALJ considered the relevant factors when assessing Claimant's testimony and found it unsupported in the record and substantial evidence supports this decision. As the Court will not reweigh the evidence when reviewing an ALJ's decision, no compelling reason exists for the Court to disturb the ALJ's credibility finding. *Cross*, 373 F. Supp. 2d at 732.

### 3.  The Court finds no error in the ALJ's SGA determination.

Claimant argues the ALJ failed to comply with SSR18-01p and "erred when he found that Plaintiff had engaged in substantial gainful activity from December 1, 2017 through December 31, 2021" because Social Security "made a determination on February 26, 2021 ["Report of SGA Determination"] that Plaintiff's earnings in 2020, when reduced for income related work expenses, were less than substantial gainful activity." (ECF No. 7 at 21). In addition, Claimant appears to argue that the ALJ erred by finding that he engaged in SGA from October 2021 through December 2021. (*Id.*). Claimant argues that the work from October 2021 through December 2021 is not supported by the New Hire report and should be "considered an unsuccessful work attempt." (*Id.* at 21-22).

The Commissioner first responds by contending that the ALJ made a typographical error by mistakenly stating that Plaintiff engaged in SGA through December 31, 2021—rather than December 30, 2020. (ECF No. 9 at 20 n.5.). The Commissioner supports this contention by arguing that because the ALJ's decision discusses "the SGA level income through 2020, but not 2021," "it is clear that the ALJ found that Plaintiff performed SGA through December 31, 2020." (*Id.*). Second, the Commissioner argues that the Report of SGA Determination "is a preliminary recommendation made by a state disability examiner at the administrative level of review and, as such, is 'neither inherently valuable or persuasive' to the final determination in this case that

21

Plaintiff performed SGA in 2020." (*Id.* at 20 (citing 20 C.F.R. § 404.1520b(c)(2))). Third, the Commissioner argues that "even if the ALJ erred in finding that Plaintiff's work in 2020 constituted SGA, any error would be harmless because the ALJ did not stop his review of the claim at step one of the sequential evaluation" but rather "considered all of the medical and other evidence for the entire relevant period, including 2020." (*Id.* at 21). Finally, regarding Plaintiff's argument that the ALJ erred in finding he engaged in SGA from October 2021 through December, the Commissioner responds that the ALJ did not consider that work SGA. Specifically, the Commissioner argues that "even though the ALJ noted that evidence showed he was working full-time in October through December 2021, the ALJ found that there was no evidence of Plaintiff's earnings during that period, so [the ALJ] did not consider that work SGA." (*Id.*).

As an initial matter, Claimant's reliance on SSR 18-01p is misplaced. SSR 18-01p is relevant to determining a claimant's Established Onset Date, which not relevant to the ALJ's decision here. Specifically, SSR 18-01p provides that "[i]f we find that a claimant meets the statutory definition of disability and meets the applicable non-medical requirements during the period covered by his or her application, we then determine the claimant's EOD [Established Onset Date]." SSR 18-01p, 2018 WL 4945639, at *2. The Sixth Circuit has observed that where "there was no finding that the claimant is disabled . . ., no inquiry into onset date is required." *Key v. Callahan,* 109 F.3d 270, 274 (6th Cir. 1997). Because the ALJ did not find Claimant to be disabled, SSR 18-01p does not apply.

Next, to the extent Claimant is challenging the ALJ's conclusion that Claimant engaged in substantial gainful activity in 2020, the Court finds no error. The record supports that Claimant earned $20,664.75 in 2020, which would average to approximately $1,722 per month. (ECF No. 5, PageID #: 268). According to the Commissioner's Program Operations Manual System

("POMS"), employee earnings averaging $1260 or more a month indicate substantial gainful activity.    POMS    §    DI    10501.015,    *available*    *at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0410501015 (last visited January 23, 2024). Thus, substantial evidence supports the Commissioner's decision that Claimant engaged in SGA in 2020.

Claimant's argument in reliance on the Report of SGA Determination does not alter this conclusion. While Claimant claims that "Social Security" made this determination, in reality the Report of SGA Determination appears to be an initial *recommendation* made after Claimant filed his applications. (ECF No. 5 at PageID #: 296-97). Claimant does not cite any authority to support that the recommendation in the Report of SGA Determination is binding on the ALJ. As such, his argument amounts to a request that the Court reweigh the evidence, which the Court will not do.

With respect to Claimant's argument that the ALJ erred in finding he engaged in SGA from October 2021 through December 2021, Claimant is incorrect. The ALJ noted that while there was evidence of this work, "there was no objective evidence this income was above the allowable earnings threshold." (ECF No. 5, PageID #: 51). Thus, it is clear that the ALJ considered this work only in relation to whether Claimant had functional limitations, not whether he had SGA. Further, even assuming the ALJ erred in finding he engaged in SGA, because the ALJ "continued the sequential evaluation process beyond Step 1 (where SGA is relevant) and denied Plaintiff's disability claim at the fifth and final step, any error at Step 1 was, at worst, harmless." *Burris v. Berryhill*, No. 5:16-CV-00092-LLK, 2017 WL 1381678, at *2 (W.D. Ky. Apr. 13, 2017).

## VI. Conclusion

Based on the foregoing, it the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying to Plaintiff benefits. Plaintiff's Complaint is DISMISSED.

Dated: February 6, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE